FILED

08/09/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2018 Session

IN RE MCKENZI W.

Appeal from the Juvenile Court for Rutherford County
No. TC-2867        Donna Scott Davenport, Judge

———————————————

No. M2017-01204-COA-R3-PT

———————————————

A mother appeals the termination of her parental rights.  The juvenile court found four statutory grounds for termination of parental rights: abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistence of conditions.  The juvenile court also found that termination of the mother's parental rights was in the child's best interest.  We conclude that the record contains clear and convincing evidence to support the grounds for termination and that termination is in the child's best interest.  Thus, we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Cheryl L. Grizzard, La Vergne, Tennessee, for the appellant, Arlene S.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

On August 20, 2014, the Tennessee Department of Children's Services ("DCS") received a report that McKenzi W., then age seven, had been sexually abused by an

unknown perpetrator. This was one of several referrals received by DCS. The child's mother, Arlene S. ("Mother"), maintained that her child had been abused at both her former and current school. Twice the Mother had taken the child to a local emergency room and a dedicated treatment center for child sexual abuse. She had also contacted the police three times.

On September 19, 2014, in the Juvenile Court for Rutherford County, Tennessee, DCS petitioned to declare the child dependent and neglected, for emergency temporary legal custody, and for a finding of severe abuse. The petition revealed that, when interviewed by a police detective a few days prior, the child disclosed that her mother looked at the child's genital area daily and accused the child of having sex. The child further disclosed that Mother would beat her with a belt until the child admitted someone had sexually assaulted her. The child told the detective that she had not been molested but that she felt she had to lie to please Mother.

Based on the petition, the juvenile court entered an ex parte protective custody order removing the child from Mother's custody. Following a preliminary hearing attended by Mother and her counsel, the court entered an order finding probable cause to believe that the child was dependent and neglected and in need of the immediate care and protection of the court. Specifically as to Mother, the order provided as follows:

> The last five months have been tumultuous, as evidenced by numerous allegations. The latest disclosure was that the Child falsified an incident of harm to please her Mother. The Mother is not satisfied with the explanations of multiple professionals and even left the services of [the child's therapist] after the Child had been seen only one time. According to the Mother, other persons must have convinced the child to recant her allegations. The Mother does not appear to have the ability to be objective yet in regard to the needs of the Child; the Court finds that if the Child were to be returned to the Mother's home, the pattern of recent events would likely continue.

In light of the finding, Mother was denied visitation.

The court concluded that it was in the best interests of both the child and Mother to "have psychological evaluations and counseling to get to the bottom of the existing conflict." The court specified that "[a]t a minimum . . . the evaluation (1) needs to be non-self-reporting and (2) should be conducted by a licensed clinical psychologist." The order directed that "no visitation of any kind shall occur until the psychological evaluations of both the Child and the Mother have been completed and brought before the Court."

2

DCS, with Mother's participation, developed a family permanency plan, which was dated October 1, 2014. The goal of the permanency plan, with a target date of April 1, 2015, was the return of McKenzi to Mother. The plan also included a secondary goal, to which Mother did not consent, of adoption. To reach the primary goal, the permanency plan required, among other things, that Mother "actively participate in and complete a psychological assessment with parenting and anger management components and follow all recommendations" and "actively participate in and complete a psychosexual assessment and follow all recommendations." The plan recognized that conditions had been placed on visitation, but the plan anticipated that Mother would satisfy the conditions. It required Mother, once she was permitted visitation, to maintain regular visitation. The plan also required Mother to maintain contact with DCS, attorneys, CASA, and private providers and ensure that her address was correct with DCS, her attorney, and the court.

By all accounts, Mother complied with many of the plan requirements in a prompt manner. But Mother failed in obtaining a non-self-reporting psychological evaluation and counseling. Because of a lack of trust, Mother declined DCS's assistance in arranging for an evaluation. On her own initiative, Mother obtained a psychological evaluation in early 2015 that was rejected by DCS as being non-compliant with the court's directive. In March 2015, Mother obtained an evaluation from another provider and forced the issue of the evaluation's sufficiency by filing a motion for return of custody or visitation. Following a hearing, the court found the second evaluation to be self-reporting and not in compliance with its prior order.

Over two days in May and June 2015, the juvenile court conducted an adjudicatory hearing on DCS's petition for dependency and neglect. After hearing the testimony of the police detective who interviewed McKenzi, the counselor who treated McKenzi after her removal, and Mother, the court found that Mother had "harassed and coerced the Child into making disclosures that she was being sexually abused by children at her school." The court assessed Mother's testimony as lacking credibility, referring to it as "very sketchy." The court further determined that there was no proof of any type of sexual abuse of McKenzi at school.

The court found clear and convincing evidence that McKenzi was a dependent and neglected child in that she was suffering from being subjected to unnecessary examinations and interviews as a result of Mother's unfounded claims of sexual abuse. *See* Tenn. Code Ann. § 37-1-102(b)(13)(F) (Supp. 2017). The court also found clear and convincing evidence the child was suffering from emotional abuse. *See id.* § 37-1-102(b)(13)(G). But the evidence did not rise to the level of "severe child abuse" as defined by statute. *See id.* § 37-1-102(b)(22).

Undaunted by that outcome, Mother renewed her motion for visitation. Nearly two weeks prior to the adjudicatory hearing, Mother had returned to the same licensed

psychologist who performed her last, self-reporting evaluation. On the strength of this evaluation and the fact that the adjudicatory hearing had concluded, Mother asserted that it was "in the best interests of the child to be reunited with her primary attachment and caregiver." Although noting that the child was found to be dependent and neglected based upon emotional abuse, the motion submitted, at least, "[s]evere psychological abuse was not found." The court denied the renewed motion.

The dispositional hearing on the petition for dependency and neglect took place over several days, finally concluding on November 16, 2015. In its subsequent order, the juvenile court addressed Mother's continuing claim that her child was sexually abused at school and that she did not coerce a report of abuse from her child. The court acknowledged that "Mother stands by her clear perception that she did nothing wrong and from her perspective she is not going to lie and tell McKenzi she did something that she is adamant she [did not do]." But then the court cautioned that "Mother must start with the perception of what the Court has found [in the adjudicatory order] and go forward." In the court's view,

> [t]he main barrier/difference we have between the Mother and McKenzi is perception. Their relationship is so torn due to [a] difference in perception. It is always a very difficult issue for the Court to reach a dispositional ruling when you have one person standing at point A at one end of the line and the other person standing at the other end of the line at point Z, trying to reunify; at this point th[e] relationship is torn [such] that McKenzi cannot be released to the care of the Mother even if the other issues herein were addressed.

The court ordered custody to remain with DCS. The court further ordered that, prior to visitation, Mother must have intense, therapeutic counseling. After such counseling, Mother's counselor and McKenzi's counselor could then confer on when family counseling might be appropriate as a prelude to visitation.

Just after Christmas of that year, Mother moved to North Carolina for a job promotion. In later testimony, DCS claimed that the move made communicating with Mother difficult. A family services worker testified that she attempted to call Mother twelve times between January and November 2016, but Mother never answered the phone. Although she left messages, the family services worker claimed that Mother never responded. Mother denied not returning messages, but she did explain that she had poor cell service at work because she worked in a basement.

Mother did provide DCS with a mailing address, which was a rented mailbox. And she continued to participate in child and family team meetings and appear for court proceedings. But no apparent progress was made on obtaining either a psychological

4

evaluation or counseling. Mother stated that she could not "get an appointment to fit within [her] work schedule or after work."

On June 22, 2016, DCS filed its petition to terminate Mother's parental rights with the juvenile court.[1] The next month, at a child and family team meeting, saw the first sign of progress on the therapy requirement since the dispositional hearing. Mother claimed that she had seen a therapist at Duke University, but she could not remember his name. She indicated that she would provide information on the therapist later, but she failed to do so.

On January 12, 2017, at another child and family team meeting, Mother stated that she was seeing a therapist and that she had authorized the release of information to DCS. But, when the caseworker called to confirm, the therapist's office said there was no release allowing him to speak with DCS. According to the caseworker, Mother finally signed the releases for the therapist on February 15, 2017. By the trial of the petition to terminate parental rights, however, the caseworker still had no information from the therapist.

Following the trial, the juvenile court terminated Mother's parental rights based upon (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; and (4) persistence of conditions. The juvenile court also determined that it was in the child's best interest to terminate Mother's parental rights. This appeal by Mother followed.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-

---

[1] The petition also sought to terminate the parental rights of McKenzi's father. The father's parental rights are not a subject of this appeal.

113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A. GROUNDS FOR TERMINATING PARENTAL RIGHTS

On appeal, Mother challenges each of the grounds found for termination of her parental rights. Specifically, Mother argues that DCS failed to prove each of the grounds by clear and convincing evidence.

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned the child under both the first and the second definitions: abandonment by willful failure to visit her child and abandonment by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (ii).

6

a. Abandonment by Failure to Visit

Under the first definition of abandonment, a parent's parental rights may be terminated if the parent "willful[ly] fail[ed] to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Because the petition was filed on June 22, 2016, the relevant four-month period is February 22, 2016, to June 21, 2016, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

In order to terminate parental rights on the ground of abandonment for failure to visit, the court must conclude that the abandonment was willful. While the question of whether a parent failed to visit presents a question of fact, whether that failure is willful presents a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit . . . a child is 'willful' when a person is aware of his or her duty to visit . . ., has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864.

If failure to visit is due to circumstances outside of a parent's control, then he or she cannot be said to have willfully abandoned the child. *In re Adoption of Angela E.*, 402 S.W.3d at 640. On the other hand, a parent cannot cure previous abandonment by attempting to visit the child after "any petition" for termination has been filed. Tenn. Code Ann. § 36-1-102(1)(F); *In re Adoption of Angela E.*, 402 S.W.3d at 640. This is because the relevant time frame for consideration of the grounds of abandonment is the four-month period preceding the filing of the petition. Tenn. Code Ann. § 36-1-102(1)(A)(i).

Mother admitted in her testimony that she had not seen her child since September 2014. But Mother argues that her failure to visit was not willful because she filed motions for visitation that were denied by the juvenile court and that the juvenile court placed "a barrier" that prevented her from visiting McKenzi. As noted above, the juvenile court ordered that "no visitation of any kind shall occur until the psychological evaluations of both the Child and the Mother have been completed and brought before the Court."

An order suspending a parent's visitation rights does not "preclude a finding that [the parent] willfully failed to visit." *In re Adoption of Angela E.*, 402 S.W.3d at 642. When the order allows the parent to resume visitation provided certain conditions are

7

met, our courts have consistently held that a parent who makes no attempt to meet the conditions to regain visitation has willfully abandoned the child. *See, e.g.*, *In re Riley C.*, No. M2015-00541-COA-R3-PT, 2016 WL 626058, at *7 (Tenn. Ct. App. Feb. 12, 2016) (holding that father's conduct was willful when he failed to take any affirmative steps to regain visitation during the relevant period); *In re Jaylah W.*, 486 S.W.3d 537, 552-53 (Tenn. Ct. App. 2015), *perm. app. denied*, (Tenn. Feb. 1, 2016) (holding mother's failure to address her mental health issues as required by court order before visitation could be resumed constituted a willful failure to visit); *In re Donald C.*, No. M2014-01327-COA-R3-PT, 2014 WL 7465684, at *6 (Tenn. Ct. App. Dec. 30, 2014) (holding mother's choice to not complete the required tasks to resume visitation constituted willful abandonment); *State v. Dep't of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005) ("Father's choice in refusing to [submit to drug and alcohol testing as a precondition to visitation] constituted a willful decision to discontinue visiting his son.").

The court provided Mother a clearly defined pathway to obtain visitation with McKenzi. She was required to obtain a psychological evaluation from "a licensed clinical psychologist" that was "non-self-reporting." Although she was able to identify several licensed clinical psychologists on her own, Mother simply refused to trust a system that did not allow her to self-report. And, again due to mistrust, she would not accept DCS's assistance in setting up a complying evaluation. We conclude that her failure to visit was willful based on this behavior. Her attempt at arranging for a psychological evaluation in North Carolina came far too late. *See, e.g.*, *In re Jaylah W.*, 486 S.W.3d at 552 ("Mother's [attempt to comply with the trial court's order to regain visitation] c[a]me[] too late.").

b. Failure to Provide a Suitable Home

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected, and

> for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id*. In evaluating those efforts, we are concerned with the time period from September 17, 2014, the day following McKenzi's emergency removal, to January 16, 2015.

8

Mother does not challenge DCS's efforts to assist during the four-month period following McKenzi's removal. Instead, Mother focuses her argument on DCS's efforts following her move to North Carolina. But this period of time is irrelevant to our consideration of this ground for termination. The juvenile court found that there was clear and convincing evidence that DCS's efforts to assist were reasonable, and based on our review, we agree. So we next must consider Mother's efforts to establish a suitable home.

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at * 7 (Tenn. Ct. App. Apr. 20, 2016). As such, "a parent's compliance with counseling requirements is 'directly related to the establishment and maintenance of a suitable home.'" *Id.* (quoting *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)).

We conclude that clear and convincing evidence supported abandonment by failure to provide a suitable home as ground for termination of Mother's parental rights. Mother's multiple, unfounded accusations of sexual abuse resulted in McKenzi's removal. Evidence showed that McKenzi's reports of abuse came only after Mother beat the child with a belt. And Mother's reports of abuse subjected McKenzi to interviews and examinations related to the investigation of Mother's claims. The juvenile court found no evidence, beyond Mother's assertions, that McKenzi had been abused at school. But the court did find a risk that Mother's behavior would continue if McKenzi was returned to Mother's home.

To address the risk, at the preliminary hearing on the petition for dependency and neglect in September 2014, the court directed Mother to obtain a psychological evaluation and to seek counseling. Mother's first, non-complying, psychological evaluation did not occur until the following year, outside the four-month period following removal.

2. Substantial Noncompliance with Parenting Plan

The juvenile court also found substantial noncompliance by Mother with the statement of responsibilities in the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the trial court must find that the allegedly unsatisfied permanency plan requirements are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *see also In re Valentine*, 79

9

S.W.3d 539, 547 (Tenn. 2002). Only if the permanency plan requirements are reasonable does the court determine if the parent's noncompliance was substantial. *In re Valentine*, 79 S.W.3d 539 at 547.

The juvenile court found that the requirements of the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Mother does not dispute this factual finding, and we conclude that the evidence was clear and convincing that the requirements were reasonable and related to remedying the conditions that necessitated foster care.

Instead, Mother's argument centers on noncompliance. She argues that she "fully complied with nearly all of the requirements in her Permanency Plan." She claims to have "supplied all the requested documentations, and completed an 8 week Parenting Plan." And Mother states that, although they were later determined to be insufficient, she completed multiple psychological evaluations.

We must determine if Mother's noncompliance was substantial in light of the importance of the unsatisfied requirement to the overall plan. *Id.* at 548-49. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Although our focus is not on whether the parents achieved the plan's "desired outcomes," *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009), still the "parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis," *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

In its final order, the court found, in relevant part:

> I find again that the Department made their reasonable efforts, and that the mother is in substantial non-compliance because her main barrier is her counseling. Even if she had presented herself this week, these many days with a lease, a contract, pay checks, we do not have the counseling, which stopped her visits at the very beginning, two years ago. A year and a half to two years ago for the dispositional hearing.
>
> . . . It was the only thing she always needed to do was to get her counseling.

Although Mother did meet the majority of the permanency plan requirements, she failed to meet the most important one. The psychological evaluation was the key to opening the door to visitation. Because of this one failure, Mother never received appropriate counseling, and she has been separated from her child for nearly four years

10

now. We conclude that clear and convincing evidence supported the finding that Mother was substantially noncompliant with the permanency plan.

3. Persistence of Conditions

Finally, the juvenile court found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

This ground authorizes termination of parental rights when:

The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . ., still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

On appeal, Mother argues that DCS never "check[ed] to see whether Mother's home in North Carolina would be suitable." But the suitability of Mother's home is not the focus of this issue. Removal occurred due to Mother's abuse of McKenzi, triggered by an unfounded belief that McKenzi had been sexually abused.

11

As her testimony makes clear, Mother persists in her belief that her child was sexually abused at school. Mother testified as follows:

[MOTHER]: It's the truth. I moved my daughter from one school to the other because she was raped, and I had documentation of that, but I didn't want to tell anybody. And the prescription was there that she has a sexually transmitted disease, and I would -- and I kept calling -- I kept calling – I'm sorry, Your Honor. I kept calling –

THE COURT: Just take a minute.

[MOTHER]: I kept calling [DCS Child Protective Services Worker] and telling her my daughter had been touched inappropriately, but -- because she had a sexually transmitted disease. And I gave the documentation to [Mother's first attorney] of the prescription . . . I told him I took my daughter to [McKenzi's counselor] because I keep saying, If my daughter is lying about being touched at school, she needs help. If she is not lying, and -- she still needed help. And I took all of that to my attorney. And after that, I felt drained because . . . I took it upon myself to say, My daughter had this incident. Please help her. I did not wait for DCS or anybody else to take her to get help, and nobody did. And I kept telling them, . . . . This prescription shows she had a sexually transmitted disease at seven, and I moved my daughter, and they twisted the whole story as if I was haphazardly moving my daughter from school to school. Nobody helped McKenzi. Nobody helped my daughter. Nobody helped her.

. . . .

[MOTHER]: They took her away from me.

Despite Mother's claims to the contrary, the authorities investigated her allegations but found no corroborating evidence. The juvenile court also found no evidence that McKenzi had been abused at school.

And Mother still has not acknowledged her own abuse of McKenzi. The juvenile court found that Mother had "harassed and coerced the Child into making disclosures that she was being sexually abused by children at her school." Mother seemingly prefers to believe that her seven-year-old child was abused or lying.

We conclude that there was clear and convincing evidence to support persistence of conditions as a ground for termination. The conditions that prevented McKenzi's safe return to the care of Mother still persist. There was no evidence that these conditions will be remedied by Mother. And continuation of the parent and child relationship will

greatly diminish McKenzi's chances of early integration into a safe, stable and permanent home.  McKenzi lives with a foster mother who loves and wants to adopt her.

## B. BEST INTEREST OF THE CHILD

Although Mother did not challenge the juvenile court's best interest finding on appeal, our review must extend "to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).  Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).  Tennessee Code Annotated § 36-1-113(i)[2] lists nine factors that courts may consider in making a best interest analysis.

---

[2] The statutory factors include, but are not limited to, the following:

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent . . . has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent . . ., or other person residing with the parent . . ., has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

13

The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

As our supreme court recently explained,

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The juvenile court began its best interest analysis with the observation that the main barrier for Mother throughout the proceedings was the counseling requirement. The juvenile court found that Mother had not made an adjustment of her circumstances because her mental health needed to improve to make it safe for McKenzi to return to her care. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2), (8). The court stated,

[W]e have gone over two years not seeing McKenzi and no contact when she was able to do that and immediately get the counseling. She waited a year. Therefore, I find that mother has failed to effect a lasting adjustment after Herculean efforts by the Department. And I also find that for such a duration of time, that a lasting adjustment does not seem possible.

*See* Tenn. Code Ann. § 36-1-113(i)(2), (8).

The evidence does not preponderate against these findings, which weigh in favor of termination. In the thirty months between McKenzi's removal and the trial of the parental termination case, Mother did not obtain a satisfactory psychological evaluation. The DCS caseworkers testified that they tried to work with Mother in obtaining a satisfactory assessment and in getting a release from Mother's most recent doctor. But as was clear from her testimony, Mother did not see the urgency.

This lack of an evaluation and counseling prevented Mother from visitation. *See id.* § 36-1-113(i)(3). And because she did not have visitation for such an extended period of time, Mother no longer had a meaningful relationship with the child. *See id.* § 36-1-113(i)(4). The juvenile court found that the child clearly cared about Mother but had no desire to go back to her. The evidence does not preponderate against these findings.

The juvenile court also found that the effect of a change in caretakers would have a negative effect on McKenzi's emotional and psychological condition. *See id.* § 36-1-113(i)(5). The evidence does not preponderate against this finding. At the time of the hearing, McKenzi had been with her pre-adoptive foster mother for a little over a year. Testimony established that McKenzi was adjusting well and her behavior has improved, although she was experiencing anxiety associated with the termination proceeding. The foster mother wished to adopt McKenzi, and based on the testimony, McKenzi wanted to live with foster mother. Several witnesses testified to the loving bond between foster mother and McKenzi.

Mother lost custody of McKenzi due to Mother's treatment of her. While the juvenile court stopped short of finding severe abuse, the court did state that McKenzi was emotionally abused. Evidence of emotional abuse by a parent is a factor that weighs in favor of terminating that parent's parental rights. *See id.* § 36-1-113(i)(6).

From the totality of the circumstances, we conclude that clear and convincing evidence supports the juvenile court's conclusion that termination of Mother's parental rights was in the child's best interest.

**III.**

The record contains clear and convincing evidence to support terminating

Mother's parental rights on all four grounds relied upon by the juvenile court: abandonment by failure to visit, abandonment by failure to provide a suitable home, noncompliance with the permanency plan requirements, and persistence of conditions. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating the parental rights of Mother.

_____
W. NEAL McBRAYER, JUDGE